UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CLARKE,<br><br>*Petitioner,*<br><br>v.<br><br>NASSAU COUNTY CORRECTIONAL CENTER ET AL<br><br>*Respondents.* | No. 25-cv-06773 (GRB)<br><br>DECLARATION OF SUPERVISORY DETENTION OFFICER JOHN C. DIAZ |

I, John C. Diaz, declare:

1. I am a Supervisory Detention and Deportation Officer ("SDDO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS"). I have served in this capacity for two and a half years. As an SDDO, I manage the cases of aliens who are in immigration proceedings. I have access to the DHS administrative files for Petitioner Erron Anthony Clarke, assigned alien number 236 404 038. The following representations are based on my review of Petitioner's DHS administrative file and consultation with my colleagues.

2. I submit this Declaration in response to the Court's December 11, 2025, Second Supplemental Order to Show Cause.[1]

*Dates and Times of Detention, and Reason for Transport*

3. On December 5, 2025, at 12:30 p.m., the Petitioner was identified and arrested.

4. On the same day, December 5, 2025, the Petitioner was transported to the Central Islip Hold Room ("CIHR"), where he was booked in at 11:28 p.m. The following day, on the

---

[1] The events leading up to this Petitioner's detention and placement in removal proceedings have been discussed in a previous declaration, and will not be revisited here.

morning of December 6, 2025, the Petitioner was booked out of CIHR at 10:02 a.m. and transported and booked into the Nassau County Correctional Center ("NCCC") at 11 a.m., having spent a total of ten hours and thirty-four minutes at CIHR.

5. On December 9, 2025, the Petitioner was booked out of NCCC at 3:45 p.m., and into CIHR on the same day at 3:53 p.m., having spent two days, sixteen hours and forty-five minutes at NCCC.

6. The Petitioner was moved after this period because NCCC does not house DHS detainees for more than seventy-two-hour periods.

7. On the same day, December 9, 2025, the Petitioner was booked into CIHR at 3:53 p.m., and booked out on December 10, 2025, at 8:30 p.m., having spent one day, sixteen hours and thirty-seven minutes at CIHR.

8. On the same day, December 10, 2025, the Petitioner was transported to Delaney Hall Detention Facility ("DHDF") where he was booked in at 9 p.m.

9. On December 12, 2025, at 9:39 a.m., the Petitioner was released pursuant to this Court's December 11 order, having spent one day, twelve hours and thirty-nine minutes in detention at DHDF.

10. The Petitioner was transported out of CIHR and out of DHDF, because absent extraordinary circumstances, DHS detainees are not kept in hold rooms, including CIHR, beyond seventy-two hours, and most detainees are transferred out within twenty-four hours. That is because CIHR is not equipped with long-term amenities such as showers and bunk beds, and therefore, DHS makes all efforts to move CIHR detainees into longer-term facilities after twenty-four hours, for their benefit.

11. This case is no different, in that DHS did not want the Petitioner to go longer than twenty-four hours without access to a shower and a bed, and that is why he was transported first to NCCC, and then to DHDF. Specifically, the Petitioner was moved out of CIHR after he spent ten hours and thirty-four minutes during his first stay at CIHR, and sixteen hours and thirty-seven minutes during his second stay at CIHR.

12. The Petitioner was moved out of CIHR on December 10, for the same reason: to comply with temporal limitations on stays at those facilities intended for the benefit of detainees.

13. The Petitioner was also moved out of NCCC on December 9 for the same reason. As mentioned above, it was because NCCC does not house DHS detainees for more than seventy-two-hour periods. Therefore, the Respondent was moved out of the aforementioned facilities for the same reason, temporal limitations intended for the benefit of detainees.

*Amenities and Phone Calls at CIHR during the Petitioner's Detention*

14. It is not the case that the Petitioner was not provided with clean clothing, toothbrushes, or bedding. The staff at CIHR offers clothing to all detainees, including sweatshirts, sweatpants, and T-shirts, as well as a toothbrush. The Petitioner was offered those items, which he declined, as well as a meal and water, which he accepted.

15. CIHR does not offer showers, as it is intended for less than twenty-four hours' stay, as was the case with this Petitioner. However, we do offer antibacterial wet wipes, as well as mats for bedding and mylar blankets.

16. Lights do remain on at all times at CIHR because if lights were turned off, it would be pitch black, which would create a security issue. However, we are currently reviewing the option to dim the lights during night hours.

17. CIHR is consistently heated, and no HVAC issues were reported during the Petitioner's stay there.

18. The Petitioner was offered a phone call, which he used to call his wife. DHS does not have any policy to limit the number of phone calls allowed, and often detainees at CIHR call a family member, as well as their attorney. This Petitioner did not request to call an attorney.

19. DHS is not able to offer in-person visitations at CIHR due to space restrictions. However, when attorneys call DHS asking to speak to a detainee, DHS connects them with their clients, and also provides a private room for the detainee in which to take such a call.

20. No attorney reached out to DHS to speak with this Petitioner during his stay at CIHR.

21. This petitioner was also offered the opportunity to speak with the Jamaican consulate but declined.

22. Detainees at CIHR are offered three meals a day if they are present during those mealtimes. However, given the temporary nature of the detention at CIHR, it is often the case that detainees are not housed for an entire day, and therefore they are not provided with the three meals that would have been provided if they were present from morning to evening.

23. Here, the Petitioner was initially booked in at CIHR on December 5 at 11:28, so he would have received lunch and dinner, but not breakfast. The following day, he would have received breakfast prior to being moved to NCCC and received the rest of his meals there.

24. On December 9, the Petitioner was again booked into CIHR at 3:53 p.m., so he would not have received breakfast or lunch, but would have received dinner. However, the following day, December 10, he was present until 8:30 p.m., so he would have received breakfast, lunch and dinner at CIHR.

25. Again, CIHR does not have bunks or beds, but DHS does provide mats and blankets.

*Physical Description of CIHR*

26. CIHR consists of four cells. Two of those cells measure approximately ten feet by seven feet, and the other two cells measure approximately eight feet by ten feet. Please note that these are approximations based on measurements with a tape measurer, not architectural specifications from the General Services Administration.

27. CIHR has toilets, each of which has a built-in sink on top of the water tank that functions similarly to a water fountain.

28. DHS is concerned that the public release of a photograph of CIHR, as it may aid detainees and outside persons in attempting to circumvent security measures at CIHR. A photograph may inadvertently show door mechanisms, camera coverage, blind spots, or construction weaknesses. Once shared, that photograph may be widely disseminated, and could be used to plan escapes, assaults, or contraband activity. Restricting cell photography helps protect officers, detainees, and the overall security of the hold room.

29. Even if a photograph is submitted securely, a photograph of CIHR does not exist, and would have to be taken. This presents its own set of challenges. CIHR is populated 24/7 by detainees, and taking photographs while detainees were present would create privacy concerns for those detainees. Redacting photos with detainees in them may reduce the visibility of the room, and therefore the usefulness of the photograph.

30. Moving detainees out of CIHR for the purpose of taking photographs is also challenging, because those detainees would have to all be transported to a different facility,

potentially causing some of those detainees to miss in-person court hearings. For these reasons, DHS is not prepared at this time to provide photographs of CIHR.

*Medical Care*

31. Medical care is not provided on-site, but any detainee who expresses a need for medical attention is immediately transported to a hospital, where they are evaluated. DHS is then advised by the medical professionals whether the detainee requires admission and further medical attention at the hospital, in which case DHS arranges for an officer to accompany the detainee during their hospital admission.

32. DHS currently has several detainees admitted at various hospitals where DHS officers have been directed to accompany them during their stay.

33. DHS asks all detainees, as a regular part of their intake at CIHR, whether they have any medical issues to report, and whether they take any medication.

34. This Petitioner was asked these questions, and he responded that he is in good health, and that he does not take any medication.

35. DHS does not administer medication at CIHR. However, if a detainee requires prescription medication, DHS transports them to a facility where such medication can be administered.

36. Again, this Petitioner did not express such a concern, but other detainees who do express a need for prescription medication are transported to facilities where such medication is administered.

37. Pursuant to 28 U.S.C. § 1746, I, John C. Diaz, hereby declare under penalty of perjury that the following is true and correct:

Executed at New York, New York

this 15th day of December, 2025.

_____
John C. Diaz
Supervisory Detention and Deportation Officer
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security