UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------x

ERRON ANTHONY CLARKE,

        Petitioner,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.

        Respondents.

------------------------------------------------x

**FILED**
**CLERK**
12/18/2025 11:49 am
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM
& ORDER**
25-CV-6773 (GRB)

**GARY R. BROWN, United States District Judge**:

> *In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously . . . If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.*

>           -Justice Louis Brandeis
>           *Olmstead v. United States* (1928)

    This opinion sets forth the bases for this Court's emergency bail determination herein, which include the inhumane and unlawful treatment of the Petitioner (and many others) by U.S. Immigration and Customs Enforcement (ICE). The disturbing revelations that follow are rendered more egregious because some depredations inflicted by ICE were undertaken[1] within the confines of the Central Islip Federal

---

[1]   Notably, regarding ICE's decision to house detainees overnight in the Central Islip facility, as has resurfaced in recent Government litigation, "the Suffolk County Bargain and Sale Deed conveying the land on which the Courthouse in Central Islip [] sits to the federal government [provides that] '[t]he Federal Courthouse and Federal Building shall not be designed or altered for the overnight housing and/or custody of prisoners or detainees.'" *See Hernandez Lazo v. Noem, et al.*, 25-CV-6639 (NJC) (EDNY) (citing *U.S. v. Deronian*, 25-cr-210 (SJB) (EDNY)).

Courthouse, a facility built "to guard the Constitution and the rights of individuals from [ ] dangerous innovations in the government."[2]

Appallingly, in this matter, little of the following is disputed: Erron Anthony Clarke entered the United States legally at the behest of an employer.  He has no record of violence, drug use or criminal history.[3]  On December 5, 2025, ICE agents arrested and detained Clarke.  He became one of nine men locked in a putrid and cramped "hold room" – a small cell containing an open toilet – designed to briefly detain a single individual.  ICE held them, day after day, without access to bunks, bedding, soap, showers, toothbrushes or clean clothes.  The space is unheated or poorly heated at night, while the outside temperature dropped to as low as 21 degrees.  The men were provided two packaged meals a day.  To the extent they could sleep, they did so, crammed on the filthy floor, while the lights blared 24 hours a day.

ICE agents transported Clarke to the Nassau County Correctional Center ("NCCC"), a facility that houses accused and convicted violent criminals, but at least is designed for residential detention of arrestees.  That period of relatively humane treatment ended abruptly.[4]  On December 9, ICE agents returned Clarke to the Central

---

[2]   Alexander Hamilton, *The Federalist Papers*, No. 78.

[3]   While Clarke did overstay his visa, such action is not a criminal offense.  *Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

[4]   "ICE is confident in the ability of its state and local partners to lawfully, safely, and humanely manage detainees in a correctional setting." USCIS, *National Detention Standards*, Revised 2019 at 2.  https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.  For reasons unknown, this statement appears to have been excised from the 2025 revision of these standards.

Islip hold room, where he would spend two more days and nights in the same inhumane conditions.  Only hours before Clarke was supposed to appear before this Court, ICE, ignoring this Court's order to produce him for a hearing, removed Clarke from the Central Islip Courthouse and transported him to a private detention facility in Newark, New Jersey.

For its part, during the pendency of this proceeding, USCIS has (1) filed sworn evidence from a supervisory officer containing rank hearsay and demonstrably false statements, (2) ignored at least three court directives and (3) blatantly refused to comply with a court order.

On December 11, 2025, at a hearing at which Clarke was forced to participate by telephone, this Court ordered his immediate release on bail.

ICE again held him overnight before, finally, releasing him on December 12. This decision follows.

## FACTS

Clarke, a national of Jamaica, entered the United States with a Jamaican passport, and an H-2B visa[5] issued by the U.S. Government in 2018.  Docket Entry ("DE") 6 at 4-6. He remained employed, proving to be an "exemplary employee with no history of violence, drug-related activities nor criminal activity."  DE 1 at 3; *cf*. DE 10 at 11.  When his visa expired in November 2018, Clarke remained in the United States without

---

[5]  "The H-2B program allows U.S. employers or U.S. agents who meet specific regulatory requirements to bring foreign nationals to the United States to fill temporary nonagricultural jobs."  https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers.

authorization.  In 2023, he married a U.S. citizen, which may entitle him to permanent residency in the United States.  DE 6 at 8.

On November 6, 2025, Clarke's spouse filed an application with DHS for "Adjustment of Status to permanent residence," along with a copy of their 2023 New York State marriage license, sponsoring him for permanent legal residency (the Adjustment Application).  DE 1 at 2; DE 6 at 13-14.  The Adjustment Application remains pending.  *Id.*  In that application, Clarke truthfully acknowledged that he had "worked in the United States without authorization" and thereby "violated the terms or conditions of [his] nonimmigrant status."  DE 9-1 at 6.  On November 15, 2025, DHS issued a notice to Clarke directing him to appear at an office in Hauppauge on December 5, 2025, at 11 a.m.  DE 6 at 17 (the "Biometrics Notice").  That notice explained that "[t]o process your application [ ], U.S. Citizenship and Immigration Services (USCIS) must collect your biometrics."  *Id.*  The Government has submitted sworn evidence that the Biometrics Notice and the resultant December 5, 2025, appointment was "a regular part of his application."  DE 9-1 at 2.

ICE claims that the filing of the Adjustment Application on November 5, 2025, led to the commencement of an "investigation" that "confirmed what the Petitioner stated . . . that he had remained in the United States" after the expiration of his visa.  *Id.* In other words, ICE's "investigation" revealed that Clarke's statements were true, and the investigation consisted principally – if not exclusively – of an ICE agent "review[ing] federal databases to confirm that the Petitioner had overstayed his visa, as he had indicated on that form."  *Id.* at 1.  One cannot imagine such an investigation –

4

purportedly commencing with Clarke's November 6 filing – taking more than a few moments.

At this point, the declaration filed by ICE becomes dubious.  The ICE agent swears that "[b]ased on that investigation, Acting Supervisory Detention and Deportation Officer John T. Keane executed a Form I-200, Warrant for Arrest of Alien." *Id.* at 2.  Yet the documents submitted do not fully support this.  The arrest warrant is unsigned and dated December 5, 2025 – the date of Clarke's biometrics appointment and ensuing arrest – and bears no time notation.  DE 9-1 at 9.  That warrant offers check boxes to indicate the basis of probable cause; the only box marked states the warrant emanated from "biometric confirmation of the subject's identity and a records check of federal databases." *Id.*  Thus, the warrant was issued after the biometric appointment.  Crucially, in issuing the warrant, the officer did not indicate that removal proceedings had been commenced, even though there are two boxes to so indicate. *Id.*  At the Court's direction, ICE also supplied a Notice to Appear (NTA) – the charging document that commenced removal proceedings.  DE 9-1 at 13-15.  The NTA is also dated December 5, 2025, again without a timestamp. *See id.*  There remains a serious question as to whether the NTA preceded Clarke's arrest; if not, then ICE improperly arrested him.[6]  ICE's declaration offers no insight into this question.

---

[6] "The NTA begins the removal process, and at that time or after its issuance, the Government can then effectuate his arrest, and, if necessary, detention, until removal proceedings are completed." *Gopie v. Lyons*, No. 25-CV-05229-SJB, 2025 WL 3167130, at *1 (E.D.N.Y. Nov. 13, 2025).

Consistent with the Biometric Notice, Clarke appeared at the USCIS office in Hauppauge, where ICE employees collected his fingerprints. According to ICE, "at 12:15 p.m., the Petitioner was encountered by ICE while in a vehicle in Hauppauge New York.[7] He was pursued and pulled over in Central Islip, New York." *Id.* at 2. Then, ICE reports "he was transported to the Central Islip hold room where he was booked at 11:28 p.m."[8] *Id.* at 3. He remained there, the agent avers, until 11 a.m. on December 6, at which point he was transported to NCCC. *Id.*

Unfortunately, that was not Clarke's last encounter with the Central Islip hold room. On December 9, he was transported back to the hold room, where he was booked in at 3:53 p.m. and remained at the time of filing the declaration on December 10. *Id.*

At the December 11 hearing, in response to inquiries from the Court, Clarke described the conditions of confinement in the Central Islip hold room, which the Government has not meaningfully challenged. In a brief colloquy, Clarke indicated that ICE detained him for the second time at the Central Islip hold room until transferring him to Newark at 10:45 p.m. on December 10. Tr. 33. Thus, his second stay exceeded 36 hours. He described being held in a hold room with eight other men and identified four such rooms in the Central Islip Federal Courthouse Building. *Id.* at 34. The detention

---

[7]    As this "encounter" occurred less than two miles away from the USCIS office and 75 minutes after the scheduled start of his biometrics appointment, it could not have been merely fortuitous.

[8]    Given that Clarke's reported "booking" time at the Central Islip hold room was nearly 12 hours after his arrest in Central Islip, the accuracy of these booking times may be suspect.

rooms had no shower facilities and no beds, so detainees "had to lie straight on the ground." *Id.*  They were provided two meals per day.  *Id.*  ICE did not provide changes of clothing or toothbrushes.  *Id.* at 34-35.  The lights remained on "[a]ll night, all day," and the nights were "cold."  *Id.* at 35; *cf. Tenezaca Pucha v. Genalo*, 25-cv-6905 (SJB), DE 11-1 (female detainee reporting Central Islip hold rooms "were freezing cold. Only cold air would blow through the vents.").  One or two officers supervised the detainees.  Tr. at 35.

The next day, further details concerning the detention conditions emerged in another petition hearing before my colleague Judge Choudhury.  *See Hernandez Lazo v. Noem, et al.*, 25-CV-6639 (NJC).  Like Clarke, Hernandez Lazo was held in the Central Islip hold room twice, once for about 9 hours on December 2, 2025, the second time for more than 13 hours overnight between December 3 and 4.  At the hearing, Hernandez Lazo described the room in which he and five other detainees were held as being six feet by six feet.  Tr. of Proceedings dated December 12 at 7-8.  An open toilet was in the center of the room, such that when the detainees tried to sleep, they had to lie around the toilet.  *Id.* at 10-11.  The room reeked of urine.  *Id.* at 11.  Hernandez Lazo reported that the detainees were provided mats on which to lie down.  Tr. 9.[9]

At the time of the hearing in this case, which was early afternoon on December 11, Clarke had been held at the Newark ICE detention facility for about 15 hours.

---

[9]   Ironically, this small accommodation – providing yoga mats to hold room detainees upon which to sleep – is a violation of ICE's *National Detention Standards* (see *infra*).  The reason is obvious: hold rooms are neither intended nor designed for overnight detention.

Notably, he could not describe the facilities there because "I've been here from 10:45 last night and I'm not even checked in as yet.  I went through the process, just finishing.  So I haven't seen anywhere or gone anywhere."  Tr. 38.

At the hearing, the Court directed Clarke's immediate release on bail, arranging for his wife to proceed directly to Newark to pick him up.  Tr. 50.  The Court specifically held as follows:

> I'm going to order him [ ] released immediately.
>
> I want to get him out of there as soon as we can.
>
> I'm releasing the petitioner pending resolution of the petition.
>
> If you need something else that says, from me, he needs to be released from Newark now, I will sign something that says he will be released from Newark now while she's driving there.
>
> If there's more things you need signed, I will sign anything necessary to effect the Court's decision.

Tr. 50-58.  The Court then executed a Release Order providing for Petitioner's immediate release, electronically providing it to Government counsel at 2:10 p.m. Notwithstanding this Court's unequivocal and repeated dictate, ICE held the Petitioner another night, finally releasing him on December 12.   DE 11-1, ¶ 9.

After the hearing, the Court entered an order seeking additional information from ICE, which stated, in relevant part, as follows:

> In furtherance of the Court's review of this matter, and based on issues raised by the filings made and the proceedings, Respondents are hereby

8

ORDERED to file a written response regarding Petitioner's stay in the facility referred to as the "Central Islip Hold Room" (CIHR):

1. List the dates and times - including arrival and exit times -- at which the Petitioner was detained at the CIHR. With respect to Petitioner's second detention there, beginning on December 9 as per the Government's declaration, provide the reason(s) for the removal of the Petitioner from the Nassau County Correctional Center and readmission to the CIHR, as well as the reason(s) underlying his removal from the CIHR and transfer to ICE's Newark facility shortly before this Court's hearing. [ ]

. . . .

3. Provide a description (including dimensions and capacity) and photographs of the hold room where Petitioner was detained . . .

Electronic Order dated December 11, 2025.   In response, the Government filed a declaration from Supervisory Detention Officer John C. Diaz, based entirely on ICE records and conversations with other officers.  DE 11-1 ¶ 1.

In addition to being rank hearsay, the information presented in the Diaz Declaration proves evasive and demonstrably false.  For example, Diaz swears that Clarke "was booked out of NCCC at 3:45 p.m., and into CIHR on the same day at 3:53 p.m." *Id.* ¶ 5.  Given that the two facilities are more than twenty miles apart, requiring a drive of 35 minutes or more, it is physically impossible that ICE officers moved Clarke from one facility to another in eight minutes.  Even more preposterous is Diaz's sworn statement that Clarke was "booked out [of the Central Islip hold room] on December 10, 2025, at 8:30 p.m." and then "transported to Delaney Hall Detention Facility ("DHDF")

9

[in Newark. N.J.] where he was booked in at 9 p.m." *Id.* ¶¶ 7-8.  Since that journey of about 60 miles consumes, depending on traffic, more than 90 minutes to as much as three and a half hours, it is again objectively impossible that the transport was completed in 30 minutes.

These misstatements of fact serve to undermine the information presented and the reliability of the records maintained by ICE.  Moreover, the declaration contains material misstatements.  Clarke's stay at the NCCC provides a powerful example.  Diaz presents a series of booking times and concludes under oath that Clarke spent a total of under 65 hours at the NCCC.  *Id.* ¶¶ 4-6 (stating that Clarke "spent two days, sixteen hours and forty-five minutes at NCCC.").  This is important, Diaz emphasizes, "because NCCC does not house DHS detainees for more than seventy-two-hour periods."[10]  *Id.* ¶ 6.  However, examination of the NCCC booking times presented by Diaz in his declaration – from December 6 at 11 a.m. to December 9 at 3:45 p.m. – reveals that Clarke spent about 77 hours at NCCC.[11]

While there are other misstatements in the Diaz Declaration, of greater concern is ICE's failure or refusal to provide information ordered by the Court.  First, though ICE provided its approximate measurements of the Central Islip hold rooms (four rooms

---

[10]  That there is a "72 hour rule" with respect to housing at NCCC – the same time limit ICE now applies to detention in holding cells -- raises potential questions as to the nature of the facilities being utilized there.

[11]  In recent days, ICE and Nassau County have come under public scrutiny for systematically violating its 72-hour rule provided in their agreement.  *See, e.g.,* "Immigrants Held Longer Than Allowed," *Newsday*, December 12, 2025; "Nassau County breaks its own rules by keeping ICE detainees too long, activists claim," *New York Post*, December 12, 2025.

measuring, according to Diaz, about 10' x 7' or 8'), nowhere in his declaration does he provide the capacity of those cells, a critical question here. *Id.* ¶ 26. While even that could be seen as a convenient omission, ICE has flatly refused to provide the requested photographs of the facilities. *Id.* ¶ 30 ("DHS is not prepared at this time to provide photographs of CIHR."). Though legally immaterial – DHS was ordered to provide such photographs – part of the expressed rationale proves revelatory. Diaz avers that:

> CIHR is populated 24/7 by detainees, and taking photographs while detainees were present would create privacy concerns for those detainees. [ ] Moving detainees out of CIHR for the purpose of taking photographs is also challenging, because those detainees would have to all be transported to a different facility.

*Id.* ¶¶ 29-30. If ICE is incapable of clearing a cell for the split second it takes to snap a photograph, it raises – or perhaps answers – other questions, such as ICE's ability to clean, inspect and maintain the Central Islip hold rooms.

Finally, the Diaz Declaration revealed, for the first time, that ICE failed to comply with this Court's verbal, written and electronic orders for Clarke's immediate release, holding him for yet another overnight stay in ICE detention. *Id.* ¶ 9. No excuse or explanation has been offered.

## PROCEDURAL HISTORY

This matter was commenced upon the filing of a petition for a writ of habeas corpus on December 8, 2025. After review, the Court entered a show cause order setting a briefing schedule, directing the parties to appear before the Court for a hearing three days later on December 11, providing that "Petitioner shall be produced in Court

at that time" and making provisions to protect "Petitioner's interests in participating in further proceedings before this Court."  Electronic Order dated December 8, 2025.  The next day, the Court entered an order directing submissions and inquiring as to whether the respondents "have any cause to oppose petitioner's release on bail pending resolution of the petition."  Electronic Order dated December 9, 2025 (citing *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001) ("[F]ederal courts have the same inherent authority to admit habeas petitioners to bail in the immigration context as they do in criminal habeas cases.")).

The parties submitted additional materials, and the Court entered an order seeking additional documentation on December 9, 2025.  DE 7.  On December 10, ICE filed a declaration.  DE 9.  On December 11, 2025, counsel for both parties and the Petitioner's wife and cousin appeared, but the Government failed to produce the Petitioner as directed.  While both the Court and Government counsel were under the impression that Clarke remained in the Central Islip hold room, it was then revealed that he had been transferred, hours earlier, to Newark.  After some time, a phone line was secured such that Clarke could participate in part of the proceeding virtually.

At the end of the proceeding, the Court ordered Clarke released immediately on bail.

### DISCUSSION

*Consideration of Bail in an Immigration Habeas Case*

In *Mapp v. Reno*, the Second Circuit, following an exhaustive survey of the caselaw, concluded that "federal courts have the same inherent authority to admit

habeas petitioners to bail in the immigration context as they do in criminal habeas cases." 241 F.3d at 223.  At the same time, the Circuit acknowledged that "this power is a limited one, to be exercised in special cases only." *Id.* at 226.  To make this determination, "a court considering a habeas petitioner's fitness for bail must inquire into whether the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (quoting *Iuteri v. Nardoza*, 662 F.2d 159, 161 (2d Cir. 1981)).

*The Nature of Petitioner's Claims*

Petitioner's claims are focused on whether ICE afforded Clarke due process in connection with his detention without bail.  *See* DE 1.  In evaluating the Due Process Clause implications of these circumstances, the Court must first define the nature and magnitude of the deprivation involved.  "It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (holding that petitioners in habeas proceedings were entitled to an informal hearing prior to the revocation of parole).  "Whether any procedural protections are due depends on the extent to which an individual will be condemned to suffer grievous loss." *Id.* (internal quotation omitted).

In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court set forth the factors to be considered in determining the procedures that are due in connection with a deprivation:

> (1) "the private interest that will be affected by the official action;" (2) "the
> risk of an erroneous deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or substitute procedural
> safeguards;" and (3) "the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail."

*Id.* at 335.  The Second Circuit has instructed that "*Mathews* is the test for both when a hearing is required (i.e., pre- or post-deprivation) and what kind of procedure is due a person deprived of liberty or property."  *Brody v. Vill. of Port Chester*, 434 F.3d 121, 135 (2d Cir. 2005).

Certainly, deprivation of liberty is a most serious matter.  As the Second Circuit noted in an immigration detention case:

> Here, the private interest affected by the official action is the most
> significant liberty interest there is—the interest in being free from
> imprisonment. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 124 S.Ct. 2633, 159
> L.Ed.2d 578 (2004). Case after case instructs us that in this country liberty
> is the norm and detention "is the carefully limited exception." *United
> States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).
> "We have always been careful not to minimize the importance and
> fundamental nature of the individual's right to liberty." *Foucha v.
> Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); *see also
> Hamdi*, 542 U.S. at 529–30, 124 S.Ct. 2633. In the same vein, "[i]t is clear
> that commitment for any purpose constitutes a significant deprivation of
> liberty that requires due process protection."  *Jones v. United States*, 463
> U.S. 354, 361, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

*Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020).  As this case concerns Petitioner's detention, implicating "the most significant liberty interest there is," the Due Process interests are substantial.  *Id.*

Yet this case implicates something more.  There is evidence that the conditions of the detention are substandard, abhorrent and likely unlawful.  Thus, the nature of these conditions bears on the severity of the depravation and on the procedural requisites.

*The Conditions of Confinement*

The evidence presented to this Court, which has been largely unrebutted, demonstrates that ICE has been deploying its "holding rooms" in a manner that shocks the conscience.  Based solely on the preliminary showing here, which remains unchallenged by the Government, it appears that the conditions maintained at the Central Islip hold room, given the recklessly expanded use of these facilities by ICE, may well violate constitutional requisites.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being," which includes "provid[ing] for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety."  *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). Depriving detainees of sleep, toiletries and hygiene materials, and medical care can amount to constitutional violations.  *See Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the [Constitution].");  *Id.* at 127 ("[T]he failure to provide prisoners with

toiletries and other hygienic materials may rise to the level of a constitutional violation."); *Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) ("The failure to regularly provide prisoners with … toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions."); *Jones v. Neven*, 399 Fed. Appx. 203 (9th Cir. 2010) (subjecting inmates to round-the-clock illumination would be a clearly established constitutional violation).

And yet, one need not reach to constitutional doctrine to condemn the actions of ICE documented here. The conditions described by detainees, and largely conceded by government officials, violates standards set by USCIS for the humane treatment of those in its custody. In 2025, USCIS promulgated a set of *National Detention Standards*[12] ("*NDS*") which provides that:

> ICE has important obligations under the U.S. Constitution and other federal and state law when it keeps an individual in custody. ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled.

*NDS* at 2. Those standards define a "Hold Room" as a "secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation." *Id.* at 225.

---

[12]  https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

The *NDS* provides that "[a] detainee may not be held in a hold room for more than 12 hours." *Id.* at 37. That provision makes the balance of the standards relating to "hold rooms" sensible, such as the requisite that "Bunks, cots, beds, and other sleeping apparatus are not permitted inside hold rooms." *Id.* However, on June 24, 2025, ICE issued a policy memo by which it "waived" the 12-hour rule applicable to temporary detention, extending the period of time in which detainees may routinely be held to 72 hours ("the Waiver Memo").[13] "As a result of increased enforcement efforts," the memorandum explained, "ICE's Enforcement and Removal Operations' (ERO's) "average daily population has significantly increased to over 54,000." Waiver Memo at 2. "This increase has put additional strain on finding and coordinating transfers of aliens to available beds within the required timeline." *Id.* Notwithstanding this constitutionally and legally suspect policy change, the Waiver Memo continues to direct that "All other hold room and hold facilities requirements continue to apply to ensure the safety, security and humane treatment of those in custody in hold rooms and hold facilities." *Id.*

And that is where it falls apart. ICE has created conditions in the Central Islip hold room that violate numerous minimum standards set by ICE to ensure the safe and humane treatment of detainees. For example, the *NDS* provides that:

---

[13] While considered an internal memo, copies of the memo can be seen on various news websites. *See, e.g.,* https://iptp-production.s3.amazonaws.com/media/documents/2025.06.24_ICE_-_Nationwide_Hold_Room_Waiver.pdf.

> Single occupant hold rooms shall contain a minimum of 37 square feet
> (seven unencumbered square feet for the detainee, five square feet for a
> combination lavatory/toilet fixture, and 25 square feet for wheelchair
> turnaround). Multiple-occupant hold rooms shall provide an additional
> seven square feet of unencumbered space for each additional detainee.

*NDS* at 37.  Compare that minimum standard to the facts elicited in this case: up to nine

detainees crammed into a space for multiple days and nights, which, according to the

USCIS *NDS*, is fit for a *single* detainee held for hours.[14]  The evidence reveals that ICE is

similarly ignoring its requirements concerning the provision of seating, cleaning, safety

inspection, bedding, meals, temperature and the requirement that "[h]old rooms with

toilets shall allow for an appropriate amount of privacy."  *NDS* at 37-39.  These

revelations of abysmal, unlawful treatment come at the end of a year in which ICE

reported the death of 25 detainees held in its custody.[15]

It is against this horrific backdrop that the Court must examine the adequacy of

the procedural safeguards afforded petitioner to evaluate the merits of the petition.

*Adequacy of the Procedural Due Process Afforded to Petitioner*

As the Court has already found, this case, in many important respects, "bears

similarity to several recent decisions in which district judges in this Court and the

Southern District of New York have grappled with arrests by DHS which ran afoul of

---

[14]  Plainly, packing up to nine times the number of detainees than is warranted
implicates concerns beyond regulatory violations.  *Cano v. City of New York*, 44 F.
Supp. 3d 324, 333-34 (E.D.N.Y. 2014) (discussing prison overcrowding as potentially
unconstitutional especially when combined with aggravating adverse conditions).

[15]  https://min.house.gov/sites/evo-subsites/min.house.gov/files/evo-media-
document/11.21.25-dhs-detainee-deaths-oversight-letter.pdf.

Due Process protections, statutes and regulations."  DE 7 at 2-3 (citing *Gopie v. Lyons*,

No. 25-CV-05229-SJB, 2025 WL 3167130, at *1 (E.D.N.Y. Nov. 13, 2025) (issuing writ for

legal resident improvidently arrested and detained); *Huang v. Almodovar et al.*, No. 25

CIV. 9346 (DEH), 2025 WL 3295912, at *4 (S.D.N.Y. Nov. 26, 2025) (ordering release of

Petitioner, who entered country without legal status, and enjoined future detention

under certain circumstances)).  This case presents additional considerations arising from

the revelation of ICE's horrendous detention practices.

Judge Bulsara's decision in *Gopie* offers a precise, detailed review of the

applicable provisions governing arrests by immigration authorities, which is

incorporated herein by reference.  *Gopie* raises infirmities in ICE's detention procedures,

several of which are applicable here, including the following:

> Section 1226(a) provides that the Attorney General—or its designated
> officers—may "detain" or "release" a noncitizen, pending a decision on
> whether he is to be removed from the United States. 8 U.S.C. § 1226(a).
> This language undoubtedly vests broad authority to arrest and detain ...
> but due process must account for the wide discretion ... to arrest any
> person in the United States suspected of being removable.  This is a
> discretionary, not mandatory, action to detain a non-citizen…

> But before the Government may exercise such discretion to detain a
> person, Section 1226(a) and 8 C.F.R. 1236.1(c)(8) require ICE officials to
> make an individualized custody determination.  In numerous cases,
> judges have interpreted the statute this way: before or contemporaneous
> with detaining a noncitizen, there must be a custody determination.  ICE
> must allow the noncitizen to demonstrate to the satisfaction of the officer
> that [ ] release would not pose a danger to property or persons, and that

19

the [noncitizen] is likely to appear for any future proceeding.  And [a]n individual detained pursuant to Section 1226(a) who identifies some defect in the process governing her detention can raise that defect in a habeas action seeking release.

*Gopie*, 2025 WL 3167130, at *2 (cleaned up).

In *Gopie*, the Government failed to provide the Court with the custody determination notice.  Here, by contrast, a Notice of Custody Determination was provided.  DE 9-1 at 11.  And yet the Notice, which is unsigned, provides only that the officer "determined that, pending a final administrative determination in your case, you will be: Detained by [DHS]."  *Id.*  As this is provided via a checkbox, the form "makes no mention of whether the detention determination was made as a matter of discretion, or part of a mandatory policy, or what was considered in reaching the result."  *Gopie*, 2025 WL 3167130, at *3.  Though offered the opportunity to supplement these materials with additional declarations and/or testimony, the Government declined to do so.  The Waiver Memo provides grounds to question whether officers are exercising discretion in connection with detention determinations, as it provides that "ERO field offices no longer have the option to discretionarily release aliens."  Waiver Memo at 2.

At this preliminary stage of the proceedings, the Government has failed to demonstrate that the procedures afforded Clarke in connection with his detention were

consistent with applicable law and regulations.  Thus, the Petition raises substantial claims.[16]

*Extraordinary Circumstances*

"[A] habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective."  *Mapp*, 241 F.3d at 224 (quoting *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978)).

In this case, the existence of extraordinary or exceptional circumstances is beyond doubt.  After nearly 35 years of experience with federal law enforcement in this judicial district, encompassing service as a prosecutor and a judge, I have never encountered anything like this.  ICE's seeming disregard of procedural requisites, combined with the chillingly brutal conditions of confinement to which Petitioner has been, and presumably would continue to be subjected, cries out for immediate remedy. The Notice to Appear sets a putative removal hearing date of December 30, 2025; thus, Petitioner could be subjected to removal prior to resolution of the Petition, effectively mooting any relief.  These extraordinary circumstances require granting of bail to make the habeas remedy effective.

---

[16] Respondents' defense to these contentions largely turns on the availability of additional administrative remedies, pointing to an upcoming bond hearing before an immigration judge, an argument that was soundly rejected in *Gopie*.  2025 WL 3167130, at *3 ("a bond hearing before an immigration judge is a 're-determination' of custody—it assumes that a valid custody determination was made in the first instance.").

Finally, Petitioner proffered significant evidence tending to demonstrate that he presents neither a flight risk nor a danger to the community, and the Government presented virtually nothing to counter this demonstration. Out of an abundance of caution, the Court ordered that Petitioner's wife execute a $10,000 appearance bond. Release was directed upon its execution.

I find that, under these facts and circumstances, the release of Petitioner on bail pending the resolution of these proceedings was required by applicable law and human decency.

Considering the issues identified in this opinion, the United States Attorney for this judicial district is hereby ORDERED to submit a letter on or before December 30, 2025, identifying the steps that will be taken to address these matters and ensure compliance with the law going forward.

*ICE's Failure and Refusal to Comply with Court Directives*

ICE's failure and, in at least one instance, flat out refusal, to comply with the Court's directives along with its provision of demonstrably false evidence, requires some comment. While this matter was necessarily conducted in haste, and the Court believes that the assigned AUSA struggled to handle these matters in a reasonable fashion, ICE's transgressions which include (1) failure to produce the Petitioner for the hearing, (2) failure to provide the holding capacity of the Central Islip hold rooms, (3) refusing to provide photographs of the Central Islip hold rooms and (4) ignoring this Court's order providing for Clarke's immediate release, cannot be overlooked.

22

Of these failings, perhaps the most indefensible is the agency's refusal to provide photographs consistent with this Court's order.  A party who believes that a court order is unlawful – or in this case, unduly burdensome – does not have the right to resort to self-help.  That party has legal alternatives – like a motion for reconsideration (which certainly would have been entertained here) or an interlocutory appeal – but cannot just simply refuse to comply.  "[I]n the fair administration of justice no man can be judge in his own case, however exalted his station [or] righteous his motives.  [R]espect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom." *Walker v. City of Birmingham,* 388 U.S. 307, 320–21, 87 S. Ct. 1824, 1832 (1967); *cf. United States v. Cutler,* 840 F. Supp. 959, 966 (E.D.N.Y. 1994), *aff'd,* 58 F.3d 825 (2d Cir. 1995) ("It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.").  As the Supreme Court held elsewhere:

> We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

*Maness v. Meyers*, 419 U.S. 449, 458 (1975).

Therefore, it is further ORDERED that as part of the above-described December 30 submission, counsel for respondents shall SHOW CAUSE why the Court should not consider entering an order of contempt or some other remedy in connection with ICE's failures to follow its orders in this case.

Response by counsel for Petitioner (as well as any amicus submissions) shall be filed on or before January 12, 2026, after the filing of the above-described submissions. Reply submissions, if any, shall be filed on or before January 20, 2026.

Dated:  December 18, 2025
       Central Islip, New York

                    SO ORDERED.

                     /s/  *Gary R. Brown*
                    GARY R. BROWN
                    United States District Judge